The grand jury of Pickens County indicted the appellant and charged her in a three-count indictment with voting more than once, or depositing more than one absentee ballot for the same office as her vote, or casting illegal or fraudulent absentee ballots.
The indictment in this case, omitting the formal parts, reads as follows:
 "The Grand Jury of said County charge that, before the finding of this Indictment, Julia R. Wilder, whose name to the Grand Jury is otherwise unknown:
"COUNT ONE
 "did vote more than once, or did deposit more than one ballot for the same office as her vote, or did vote illegally or fraudulently, in the Democratic Primary Run-off Election of September 26, 1978,
"COUNT TWO
 "did vote more than once as an absentee voter, or did deposit more than one absentee ballot for the same office or offices as her vote, or did cast illegal or fraudulent absentee ballots, in the Democratic Primary Run-off Election of September 26, 1978,
"COUNT THREE
 "did cast illegal or fraudulent absentee ballots in the Democratic Primary Run-off Election of September 26, 1978, in that she did deposit with the Pickens County Circuit Clerk, absentee ballots which were fraudulent and which she *Page 153 
knew to be fraudulent, against the peace and dignity of the State of Alabama."
After a two-day trial which ended on May 31, 1979, the appellant was found guilty as charged in the indictment and sentenced to five years imprisonment. She gave notice of appeal and filed a motion for a new trial. The motion was subsequently denied when no testimony or argument was made on behalf of the motion.
The evidence presented at trial was substantially as follows:
Mr. Paul Rollins, a notary public from Tuscaloosa, was called as the State's first witness. Several days prior to the Democratic Primary Run-off Election of September 28, 1978 (hereinafter, "Run-off Election") the appellant and several other women came to Mr. Rollins' office and presented him with a number of absentee ballots to be notarized. The appointment with Mr. Rollins had been previously arranged by Maggie Bozeman. Mr. Rollins testified that on September 23, 1978, he notarized the signatures of individuals on thirty-nine absentee ballots. Although the ballots had not been signed in his presence, Mr. Rollins notarized them based upon the appellant's representation to him that the voters' signatures were genuine. Mr. Rollins testified that he was not personally acquainted with any of the individuals.
Mr. Rollins stated on cross-examination that he told the appellant he could not notarize the ballots unless the people who signed them were present. Mr. Rollins then agreed to go ahead and notarize the ballots if the appellant would take him to the individuals and let them swear an oath that they had signed the ballots. Rollins subsequently went to Pickens County where each person swore an oath that he had signed his own ballot. These oaths were taken at Maggie Bozeman's house and various other homes in Pickens County. Mr. Rollins required no identification of the individuals for the oaths.
On re-direct examination, Mr. Rollins testified he could not remember the date he visited Pickens County to verify the signatures.
Ms. Janice Tilley, a court clerk in the Pickens County Clerk's office, testified that she processes absentee ballots. She described the process as follows: a potential absentee voter must fill out an application form. This application is checked by the circuit clerk's office to determine whether the applicant is a registered voter. If the applicant is a registered voter, then an absentee ballot and instructions for voting are mailed to the voter. The voter then returns the sealed absentee ballot to the circuit clerk's office where it is placed in a locked absentee box in the circuit clerk's vault.
Ms. Tilley testified that the appellant was in the circuit clerk's office on more than one occasion for the week prior to the Run-off Election to pick up applications for absentee ballots. Ms. Tilley told the appellant that applications for absentee voting could not be picked up during the last five days before an election. In this case, the last day for obtaining applications was September 20, 1978. On September 25, 1978, the appellant asked for more applications and was refused. At this time the appellant and Minnie Dunner Hill turned in to the circuit clerk's office, approximately fifty absentee ballots.
Ms. Tilley noticed that all the completed applications for absentee ballots that had been previously turned in by the appellant contained one of the following addresses: Route 2, Box P318, Carrollton, Alabama; 532 10th Avenue Northwest, Aliceville, Alabama; or 601 10th Avenue Northwest, Aliceville, Alabama. Ms. Tilley thought this unusual and brought it to the attention of the circuit clerk, Mr. Floyd, who in turn contacted District Attorney Pep Johnston.
During cross-examination, Ms. Tilley testified that there is no requirement that applications for absentee voting be picked up by the voters themselves or that the ballots be mailed to the voters' addresses. The appellant made no representation to Ms. Tilley that any of the ballots she turned in were her own.
Pickens County Sheriff Louie Coleman testified that the absentee ballot box for *Page 154 
the Run-off Election has been in his custody since the Run-off Election. Pursuant to the court order, Sheriff Coleman delivered the absentee ballot box to District Attorney Johnston on October 10, 1978. Sheriff Coleman unlocked the ballot box and Mr. Johnston examined the contents. District Attorney Investigator Charles Tate was also present during this examination. After the examination, the sheriff re-locked the ballot box and the district attorney added his own padlock to the box.
Mr. Charles Tate testified that he was assigned to investigate alleged discrepancies in absentee voting for the Run-off Election. Investigator Tate examined the contents of the absentee ballot box brought to the district attorney's office by the sheriff. He testified that the ballot box contained three sets of ballots; accepted ballots; rejected ballots; and challenged ballots. He checked only the accepted ballots.
Investigator Tate stated that he matched the absentee ballots to the applications for absentee ballots. His examination revealed: "Quite a few of the absentee ballots were notarized by the same notary public; some of the applications for the absentee ballots were maybe signed with an X, as an example, yet the ballot itself had been signed with a legible signature or vice versa." Many of the ballots were mailed to the same addresses; and all the ballots were voted the same. Mr. Tate's investigation also revealed that the appellant's address was one of the three most frequently used on the ballots. At the conclusion of Tate's examination, the ballots were placed back in the ballot box, double locked, and returned to the sheriff.
Eighty-seven-year-old Robert Goines testified that he was a registered voter in Pickens County. He said that he applied for an absentee ballot and made his mark (X) on the application. The application was witnessed by the appellant. Mr. Goines was shown an absentee ballot containing his signature in cursive writing. Mr. Goines stated he had seen the ballot but he did not fill it in or sign it because he could not write. He also stated that he did not give anyone permission to vote for him and he did not vote the absentee ballot.
On cross-examination, Mr. Goines testified that he always made his mark with a cross. He admitted that he did not know what an absentee ballot was. He did remember two ladies coming to his house one time and later returning with a man. He told the man that his mark was on a piece of paper they had. He testified that he did not know who Paul Rollins was.
Annie Billups stated that she was a registered voter in Pickens County and voted in the Run-off Election. Ms. Billups made an "X" on an absentee ballot application brought to her by the appellant. The appellant filled out the ballot for Ms. Billups because she could not read or write. Ms. Billups told the appellant to sign her (Ms. Billups') name to the ballot. She testified that the appellant was a friend of hers.
Seventy-two-year-old Mattie Gipson testified that she was a registered voter in Pickens County and that she voted in the Run-off Election. On direct examination Ms. Gipson testified that she placed her ballot in the ballot box at the National Guard Armory polling place in Aliceville, but her testimony on cross-examination indicated that she voted by absentee ballot.
Ms. Gipson said that she made her "cross mark" on an application for an absentee ballot that was witnessed by her "step-daughter in-law," Minnie Mae Dunner. She testified she did this at the National Guard Armory.
Ms. Gipson was shown her absentee ballot and could not find where she made an "X" on the document. The ballot contained her signature in cursive writing. She testified that she could not "write at all." She also stated that she did not know Paul Rollins.
During cross-examination, Ms. Gipson testified that several ladies came to her house prior to the election. She authorized these ladies to assist her in voting.
Sophia Spann, a seventy-nine-year-old registered voter in Pickens County, stated that she did not know what an absentee ballot was. She said she had never voted *Page 155 
by absentee ballot and had always voted at the polling place in Cochran.
Ms. Spann further testified that she did not know the appellant and had never talked to the appellant about absentee voting. An application was shown to Ms. Spann containing her misspelled name, signed with an "X," and witnessed by the appellant. She denied marking an "X" on the application and stated that she did her own writing. Ms. Spann was also shown a ballot and pointed out that her name was misspelled.[1] During cross-examination, the following occurred:
 "Q. And it says Sophia Spann, but it is not spelled S-p-a-i-n?
"A. See, I spell it S-p-a-n-n, two N's.
"Q. Okay.
 "A. And Mrs. Charlene showed me that paper. I told her that ain't the way I spell it.
. . . .
 "Q. Who makes out your ballot then? You cannot read and write?
 "A. I do my own writing and my own reading. What are you talking about? I can read and write, sir.
"Q. You could read and write?
 "A. I have been reading and writing ever since I was something like that (indicating).
"Q. Oh.
 "A. My mama raised seven children. All of them could read and write."
Ms. Spann also testified that she did not know Paul Rollins. She recalled that Maggie Bozeman and an unknown male visited her. Mrs. Bozeman wanted to find out if Ms. Spann had voted that day. The male said nothing.
Ms. Spann testified that when she went to the polling place to vote she was told by the election officials that her vote had already been recorded on the absentee ballot. She told the election official that she had not authorized anyone to vote for her, and that her name on the ballot was misspelled. Ms. Spann was then allowed to vote at the polls.
Eighty-seven-year-old Nat Dancy testified that he was not registered to vote in Pickens County, but that he had voted in the past. He testified that he could not read or write and that he signed his name with a mark. He said that he knew the appellant, and that she witnessed his mark on a document that was not identified by the State. Mr. Dancy testified that the appellant explained nothing to him about the document he signed, and "she stopped me from talking and said just make a mark there."
Mr. Dancy testified that he did not make his mark on an absentee ballot purported to be his and he could not find his signature mark on the ballot. The ballot marked in evidence as State's Exhibit No. 8 shows a signature for Mr. Dancy in cursive writing. Mr. Dancy further testified that he did not know Paul Rollins and that no one had ever asked him if he had signed a "piece of paper."
During cross-examination, Mr. Dancy testified that the appellant came to his house with some papers about voting and, "If she told me to sign it, I signed it." He also testified that the appellant later came back to see him with a man.
Mamie Lavender testified that she was a registered voter in Pickens County and voted in the Run-off Election. She said the appellant came to see her about voting. The appellant "brung a paper around to our houses" and asked Ms. Lavender to sign it. Ms. Lavender could not write but she authorized Shirley Clark, who was with the appellant, to sign for her. In addition, Ms. Lavender recalled making an "X" on the paper. She testified that no gentleman ever came to her house to ask whether her mark was on the document.
On cross-examination, Ms. Lavender testified that a ballot came to her in the mail and she authorized the appellant to turn the ballot in for her. Ms. Lavender told the appellant she wanted to vote for the Democrats. *Page 156 
Lewis Minor stated that he was a registered voter in Pickens County. He testified that he voted in the general election but did not think he voted in the Run-off Election.
Mr. Minor testified that the appellant "fix[ed]" an absentee application for him. He could not read or write and he made an "X" on the application. He testified that he saw the appellant on the streets of Aliceville before the Run-off Election, and told her he would be out of town on election day. She told him she would arrange it so he could vote.
Mr. Minor said that he had never seen State's Exhibit No. 25, purporting to be his absentee ballot. But, he did tell appellant she could vote for him. He did not make the "little marks" on the ballot. The ballot was signed in cursive writing. He also testified he did not know Paul Rollins.
On cross-examination, Mr. Minor stated that the appellant helped him in voting and that she showed him a paper to sign and he "touched the pen when they made the mark."
Mrs. Lucille Harris testified that the appellant brought a paper for her to sign so she would not have to go to the polls to vote in the Run-off Election. She stated that the appellant visited her only one time and she never received a ballot in the mail. She never signed a ballot before a notary public. On cross-examination, Mrs. Harris stated that she agreed with the appellant to vote for the Democrats before she signed the paper.
Bessie Billups testified that she was a registered voter in Pickens County and that she applied to vote absentee at the prompting of the appellant. She testified that she could not read or write. Ms. Billups signed an "X" on an absentee ballot application, State's Exhibit No. 47, witnessed by the appellant.
Ms. Billups was shown an absentee ballot, State's Exhibit No. 2. She stated that she made the "X's" on the ballot, but did not sign her name at the bottom. She also testified that she did not know Paul Rollins.
On cross-examination, Ms. Billups said that the appellant had come to her house to talk to her about voting, but she did not remember how many times. She testified that she was at her sister's house when she made the "X's" on the ballot, and then gave the ballot to the appellant.
On re-direct examination, the State attempted to refresh the recollection of Ms. Billups by showing her a statement she made on October 8, approximately two weeks after the election. Ms. Billups then testified that she did not authorize anyone to fill out her ballot and did not mark a ballot herself. She testified that the signature of the ballot was not hers.
On recross-examination, Ms. Billups again stated that she made the "X's" on the document and turned it over to the appellant.
Seventy-seven-year-old Fronnie B. Rice testified that she voted an absentee ballot in the Run-off Election. The appellant and a man brought an application to her; she signed it, and gave it back to the appellant. Later, the appellant brought the ballot to her. Ms. Rice voted on the ballot, signed it, and gave it to the appellant who notarized it. Ms. Rice testified that no man ever contacted her about her voting. After having her recollection refreshed, Ms. Rice testified that she neither received a ballot nor did she sign one.
On cross-examination, Ms. Rice testified that the appellant came to her house and she remembered making some "X's." She testified that a man came with the appellant and she told them that it was her ballot and she made the "X's" on the ballot.
Eighty-year-old Clemie Wells testified that she was a registered voter in Pickens County. She made an application to vote absentee in the Run-off Election and signed her application. She testified that Mattie Lou Grice was with her when she filled out the application.
Ms. Wells testified that she had never seen State's Exhibit No. 38, purporting to be her ballot. She did not know anything about it and never received anything like it in the mail. She did not "think" she signed *Page 157 
the ballot. She also testified she did not know Paul Rollins.
On cross-examination, Ms. Wells did not remember making any "X's" on a document.
Seventy-four-year-old Lula DeLoach testified that she was a registered voter in Pickens County. She identified State's Exhibit No. 61 as her application for an absentee ballot which she signed in September, 1978. Ms. DeLoach was shown State's Exhibit No. 11, purporting to be her ballot with her signature at the bottom. She testified that she had never filled out or signed such a document. She further testified that she did not vote in the Run-off Election and that no man ever came to her house to ask if she had filled out a document.
On cross-examination, Ms. DeLoach testified that the appellant brought an absentee ballot application to her house. The appellant told Ms. DeLoach that she (the appellant) could "sign the paper" and "fix the paper for me." Ms. DeLoach stated that she had no objection to this procedure because she did not know what it was all about. She remembered a lady and a man coming to her house, but she did not sign anything for them or mark any ballot.
Charles Cunningham testified that he was registered to vote in Pickens County but that he was not qualified to vote in the September, 1978 election. He could not read or write and did not know how old he was. He testified that the appellant brought him State's Exhibit No. 46, an application for absentee voting, and he made his mark on it. Mr. Cunningham stated that he was under the impression that he was filling out a form to vote in the wet-dry referendum.
Mr. Cunningham testified that the appellant brought him a ballot; he told the appellant to fill it out and he put his mark on the ballot. He then told the appellant to sign the ballot for him.
The attorneys for both sides stipulated that the testimony of witness Maudine Latham would be "to the effect that she signed the application for an absentee ballot presented to her by Mattie Grice, that this is her signature on the application. Further, that she does not remember seeing the ballot at all." They also stipulated that the signature on the ballot was not hers.
The State recalled Paul C. Rollins as its last witness. Mr. Rollins testified that he was confused during his earlier testimony about when he notarized the absentee ballots in question. He testified that there were two sets of ballots that he notarized. The first set was prior to the September 5th primary election. During this time, Mrs. Bozeman, two other ladies, and the appellant came to his office in Tuscaloosa and he notarized some ballots. The second time was prior to the September 26th run-off election. The appellant and two women came to his office to have some more ballots notarized. Mr. Rollins did not notarize the ballots in his office at this time, but agreed to go to Pickens County to have the individual voters acknowledge their signatures. He stated that he did not remember the exact dates when he went to Pickens County, but that it was at two different times, once before the election, and once the day of the election. Mr. Rollins stated that he did not predate the ballots, but notarized and dated them the same day. The district attorney pointed out to Mr. Rollins that all the ballots in evidence were dated September 23, 1978, which was a Saturday.
The State rested its case at this point. The appellant moved to exclude the evidence listing several grounds, the principal of which was failure to prove the case. After the trial court denied the motion the defense began its case in chief.
The appellant took the witness stand in her own behalf. She testified that she had lived in Pickens County all her life and that she had been politically active in the county in concert with Mrs. Maggie Bozeman and Mrs. Minnie Dunner Hill. The appellant was actively involved in aiding people to vote by absentee ballot for the Democratic primary and the run-off election of 1978.
The appellant's testimony established that she frequently picked up applications *Page 158 
for absentee ballots at the circuit clerk's office. The circuit clerk's office would allow her to pickup only ten to twenty applications at a time. The appellant would then distribute the applications to her workers who would, in turn, take them to people who could not go to the polls or people who would be out of town on election day.
The appellant testified that the following colloquy with a potential voter would occur once she found a person who was qualified to vote absentee:
 "I would go to that person's home and talk with them and ask them — I didn't visit nobody except registered voters because that's what it was about. And I would get in there and say, `Do you want to vote this year?'
 "`What kind of election is this?' I would say, `well, it's the Democratic.' And they would say, `That's the way I want to vote.'
"You reckon you will be able to be at the polls?
"They would say, `No. You know I can't get around.'
 "And I said, `Well, would you like for me to show you how you can vote without getting down there?'
"`Yeah.'
 "And I would sit down and tell them that once you fill this form out and let me mail it back to the Circuit Clerk's office or take it back, I said, and they will mail you out a ballot. And most of the time, `Would you like for the ballot to come to you?'
 "And they would answer no, that they weren't able to, you know, get it back to me or nobody else, and they would say, `No, I can't get it to you.'
 "Would you like for me to — What would you like for me to do — let it come to my box, or how would you want it done?
"`Let it come to your box.'
 "I said, `Okay. I will do that, and when it comes, then I will get it back to you — let you decide which way you want to vote.'"
The appellant stated that she never had the absentee ballot mailed to her address unless she was instructed to do so by the applicant. For applicants whose ballots were mailed to their homes, the appellant would go to their homes and discuss with them how they desired to vote. The appellant would take with her, on these visits, a sample ballot endorsed by the Alabama Democratic Conference. The sample ballot indicated the Alabama Democratic Conference's preferences. The appellant stated that she did not mark any ballots contrary to the instructions of the absentee voters.
The appellant was then questioned concerning the testimony of Sophia Spann. The appellant stated that she took an application to Ms. Spann's house but Ms. Spann was not home. The application was left at Ms. Spann's home with an unidentified female. The appellant had no further contact with Ms. Spann. She did see Ms. Spann's ballot after it was returned to "headquarters" by one of the appellant's workers.
The appellant stated that, after the ballots were marked, the next step was to get them notarized. After this was done, an unidentified man working with the Howell Heflin campaign took them to the courthouse. The appellant said that at no time did she deliver any ballots to the circuit clerk's office.
The appellant testified that she visited Mr. Rollins in Tuscaloosa on two occasions. The first time she and Maggie Bozeman asked Mr. Rollins to notarize some ballots in connection with the primary election. The second visit was in connection with the Run-off Election. She was accompanied by Lucy Lockett and Mrs. Minnie Dunner Hill on this visit.
The appellant testified that Mr. Rollins came to Pickens County in connection with either the Run-off Election or the General Election. She testified that she and Mr. Rollins went from house to house to have ballots notarized.
The appellant stated that she signed some of the names to the absentee ballots introduced *Page 159 
into evidence in this case,[2] and that some of the workers signed some names, all done with the permission of the individual voters. The people would "touch their hand to the pen." There was no fraud involved.
The defense recalled Janice Tilley to the witness stand. Ms. Tilley identified five specific applications for absentee ballots concerned in this case. She testified that the circuit clerk's office received five absentee ballots matching the names on the above five applications. The defense admitted evidence showing that only two of those ballots were actually in the ballot box.
The defense rested its case.
 I
The prosecution in this case was pursuant to § 17-23-1, Code of Alabama 1975, which provides, in pertinent part, as follows:
 "Any person who votes more than once at any election held in this state, or deposits more than one ballot for the same office as his vote at such election, or knowingly attempts to vote when he is not entitled to do so, or is guilty of any kind of illegal or fraudulent voting, must, on conviction, be imprisoned in the penitentiary for not less than two nor more than five years, at the discretion of the jury." [Emphasis added.]
The appellant contends that § 17-23-1, supra, is constitutionally impermissible because it is "vague, indefinite and uncertain." Specifically, she asserts that the only portion of the statute relevant to her is that dealing with "illegal or fraudulent voting," and she contends that the statute must fall because it does not define what constitutes illegal or fraudulent voting.
This court, in Chambers v. State, Ala.Cr.App., 364 So.2d 416, cert. den., Ala., 364 So.2d 420 (1978), noted the general principles involved in determining whether a statute is unconstitutional due to vagueness. There the court stated:
 "The essential purpose of the `void for vagueness' doctrine is to warn individuals of the criminal consequences of their conduct. Williams v. United States, 341 U.S. 97, 71 S.Ct. 576, 95 L.Ed. 774, decided April 23, 1951; Screws v. United States, 1945, 325 U.S. 91, 103-104, 65 S.Ct. 1031, 1036, 89 L.Ed. 1495. This court has repeatedly stated that criminal statutes which fail to give due notice that an act has been made criminal before it is done are unconstitutional deprivations of due process of law, Lanzetta v. State of New Jersey, 1939, 306 U.S. 451, 59 S.Ct. 618, 83 L.Ed. 888; United States v. L. Cohen Grocery Co., 1921, 255 U.S. 81, 41 S.Ct. 298, 65 L.Ed. 516.
 "We have several times held that difficulty in determining whether certain marginal offenses are within the meaning of the language under attack as vague does not automatically render a statute unconstitutional for indefiniteness. United States v. Wurzback, 1930, 280 U.S. 396, 399, 50 S.Ct. 167, 168, 74 L.Ed. 508. Impossible standards of specificity are not required. United States v. Petrillo, 1947, 332 U.S. 1, 67 S.Ct. 1538, 91 L.Ed. 1877. The test is whether the language conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices. Connally v. General Construction Co., 1926, 269 U.S. 385, 46 S.Ct. 126, 70 L.Ed. 322." [Quoting Jordan v. DeGeorge, 341 U.S. 223, 230-231, 71 S.Ct. 703, 707-708, 95 L.Ed. 886 (1951).
The court went on to observe:
 "Vagueness challenges to statutes which do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand. U.S. v. Powell, [423 U.S. 87, 96 S.Ct. 316, 46 L.Ed.2d 228], supra; United States v. Mazurie, 419 U.S. 544, 95 S.Ct. 710, 42 L.Ed.2d 706 (1975)."
In our opinion, the words "illegal or fraudulent" as used in the foregoing statute are merely descriptive of the intent necessary for the commission of the offense. See 29 C.J.S. Elections § 341, a (1965): *Page 160 
 "Description of intent. With respect to words descriptive of intent such as `willfully,' `knowingly,' and `illegally' or `unlawfully,' etc., it would generally be sufficient to follow the words of the statute. The words of the statute, however, should be included in the indictment."
In Wilson v. State, 52 Ala. 299 (1875), the Supreme Court of Alabama observed:
 "The offence denounced by the statute, and intended to be described in the indictment, is voting more than once. An indictment for a statutory offence is generally sufficient, when it is framed in or pursues the words of the statute."
Clearly, the language of the statute reflects a common understanding that "illegal or fraudulent voting" is voting more than one ballot for the same office, or attempting to vote when one is not entitled to do so. The statute thus gives due notice of the criminal consequences of such action.
Over one-hundred years ago, our Supreme Court determined that the legislative intent of the statute was to proscribe duplicate voting. Gordon v. State, 52 Ala. 308 (1875); Wilsonv. State, supra. We should exercise our power to declare a legislative enactment void for indefiniteness only in the most extreme circumstances. Associated Industries of Alabama, Inc.v. Britton, Ala., 371 So.2d 904 (1979); Jansen v. State,273 Ala. 166, 137 So.2d 47 (1962).
In Jansen v. State, supra, the Alabama Supreme Court set out the following guidelines for the exercise of this power:
 "To be sure, courts may declare legislative enactments to be inoperative and void for indefiniteness or uncertainty in meaning. But such power should be exercised only when a statute is so incomplete, so irreconcilably conflicting, or so vague or indefinite that it cannot be executed, and the court is unable, by the application of known and accepted rules of construction, to determine, with any reasonable degree of certainty, what the legislature intended."
For the statute in question, we have the certainty provided by the Gordon and Wilson courts to guide us in determining that the legislature intended to prohibit voting more than once. Furthermore, even if, as appellant contends, the phrase "illegal or fraudulent voting" is subject to differing interpretations, we may rely on the remainder of the statute to provide a clear statement of what conduct is proscribed.Associated Industries of Alabama, Inc. v. Britton, supra. InAssociated Industries, supra, the Alabama Supreme Court observed that:
 "[e]ven if the description . . . is not free from ambiguity, that does not render the terms of the Act incapable of enforcement when a reasonable interpretation is available."
We believe that a reasonable interpretation of the predecessor to § 17-23-1, supra has already been provided for us by the courts in Wilson, supra, and Gordon, supra. Therefore, applying the principles of those cases, as well as the tests outlined in Chambers v. State, supra, to the statute and the facts of the case before us, we do not believe that § 17-23-1, supra, is unconstitutionally vague. When measured by common understanding and practice, and a long-accepted determination of legislative intent, it provides clear notice of what conduct is prohibited. See Anderson v. United States,417 U.S. 211, 227 n. 13, 94 S.Ct. 2253, 2264 n. 13,41 L.Ed.2d 20 (1974).
 II
Appellant insists that the indictment in this case was so vague, uncertain and indefinite that it failed to charge an offense or to inform her of the nature and cause of the accusations against her.
The general rule in Alabama is that it is sufficient to charge the elements of the statutory offense in the words of the statute. Gayden v. State, 262 Ala. 468, 80 So.2d 501
(1955).
The only qualification to this rule is that the indictment must apprise the accused with reasonable certainty of the nature of the accusation against him, so that he may prepare his defense and plead the judgment of conviction as a bar to any subsequent *Page 161 
prosecution for the same offense. United States v. Simmons,96 U.S. 360, 24 L.Ed. 819 (1877).
In Gayden v. State, supra, the Alabama Supreme Court set forth certain requirements for a properly drawn indictment tracking the words of the statute. The court said that, although the language of the statute may be used as a general description of the offense, it must be accompanied by the facts and circumstances informing the accused of the specific offense, setting forth with particularity the "time, place, and circumstances" of the crime.
In Gordon v. State, supra, the Supreme Court of Alabama recognized that, while a general accusation of "illegal voting" was not sufficient to support a conviction, an allegation of "illegal voting" which specified in what the illegality consisted, whether it was a want of legal qualification or voting more than once, would be sufficient.
Our examination and comparison of the indictment with the statute shown in the foregoing paragraphs reveals that the indictment follows the language of the statute. It is a plain, concise and definite written statement of the essential facts constituting the offense charged. The indictment also sufficiently informed the appellant of the particulars of the offense so that she could prepare her defense.
A sufficient indictment for fraudulent or illegal voting:
 "[m]ust ordinarily set forth the facts relied on to constitute the offense and allege that the election at which the offense was committed was held pursuant to law, and must describe the election and the intent with which the acts were committed." 29 C.J.S., § 341, supra.
A review of the three counts that made up the indictment in question shows the following:
Count one made the appellant aware that she did illegally or fraudulently vote by voting more than once by depositing more than one ballot as her vote in the Democratic Primary Run-Off Election of September 26, 1978.
Count two informed the appellant that she did cast illegal or fraudulent absentee ballots by voting more than one absentee ballot or by depositing more than one absentee ballot as her vote in the Democratic Primary Run-off election of September 26, 1978.
Count three notified the appellant that she did cast illegal or fraudulent absentee ballots by depositing, with the Pickens County Circuit Court, absentee ballots which were fraudulent and that she knew to be fraudulent.
A more concise and particular statement informing appellant of the charges she would be required to meet is difficult to envision.
It is clear that the indictment was sufficient and the trial court was correct in overruling the appellant's demurrer.
 III
The appellant complains that the State's evidence was insufficient to support her conviction. She argues that the testimony presented by the State did not "reveal a single instance of unauthorized voting." The appellant claims that there were only "some technical imperfections employed" in her assistance of absentee voters.
A brief summary of the testimony of Sophia Spann, Lucille Harris, Lula DeLoach and Robert Goines reveals evidence contrary to appellant's assertion. All these witnesses testified that they did not vote by absentee ballot, yet absentee ballots were voted in their names.
Mrs. Spann's signature, represented by an "X," appeared on the application for an absentee ballot witnessed by the appellant, but Mrs. Spann stated that she could read, write, and sign her own name. In addition, she pointed out that her name was misspelled on the absentee ballot, and that she had voted at the polls and had never sought an absentee vote application.
Lucille Harris testified that the appellant brought her a paper to fill out so that she would not have to go to the polls. She *Page 162 
recalled that the appellant only visited her on one occasion. Mrs. Harris stated that she never received or signed an absentee ballot, although an absentee ballot was voted in her name.
Lula DeLoach testified that the appellant brought her an absentee ballot application and stated to her that she (appellant) would "fix the paper" for her. Although an absentee ballot was voted in Lula DeLoach's name, Mrs. DeLoach recalled that she did not vote an absentee ballot in the run-off election. Further, Mrs. DeLoach stated that the signature appearing on the ballot was not hers.
The testimony of Robert Goines was substantially similar to that of Mrs. Harris and Mrs. DeLoach.
The testimony of Charles Cunningham seemed to indicate that the appellant used deception in assisting him to vote in the run-off election. Mr. Cunningham thought he was voting on a completely different subject.
The testimony of the other witnesses was both confusing and conflicting, and, depending on who was examining them, their testimony was favorable to both the prosecution and the defense. Under these circumstances, only a jury could unscramble the hodge-podge of the testimony. At any rate, the conflicting evidence presented a jury question. The truthfulness of the testimony was for the trier of fact. May v.State, Ala.Cr.App., 335 So.2d 242 (1976).
We agree with appellant that no offense is committed merely by picking up applications for absentee ballots, or returning the completed applications, or using someone else's address for the return of the ballots. However, when this evidence is considered, along with the testimony of the above four witnesses and the irregularity in notarizing the ballots, a reasonable inference inconsistent with the appellant's innocence exists. Cooper v. State, 235 Ala. 523, 180 So. 102
(1938).
Circumstantial evidence must be accorded the same weight as direct evidence when it points to the accused as the guilty party. Locke v. State, Ala.Cr.App., 338 So.2d 488. Certainly a jury could reasonably infer that appellant voted the fraudulent absentee ballots. Locke, supra.
Therefore, we conclude, after according the verdict all reasonable presumptions of correctness, that the evidence was sufficient to support the verdict. We are convinced that the verdict was not wrong or unjust and was not patently against the weight of the evidence. Bridges v. State, 284 Ala. 412,225 So.2d 821 (1969).
 IV
The appellant insists that she was denied a fair trial when the prosecutor, in his closing argument, improperly appealed to the passion and prejudice of the jury. The appellant argues that the State made several references to the attitude of black people toward the trial. She insists that the comments were significant because the jury in her case was all white and no other white persons were in the courtroom except court officials. The appellant argues that the prosecutor attempted to create the impression that black people were troublemakers when he mentioned the fact that he had to prosecute another case involving blacks on the completion of the appellant's trial.
The specific comment to which the appellant refers is found in the following portion of the record:
 "MR. JOHNSTON: All right. Ladies and Gentlemen, I am going to quit. I have got a murder case to try as soon as we get through with this. It involves some black people. It involves a black man who was killed.
 "MR. SEAY: Your Honor, may I approach the bench again?
"(Bench conference).
 "THE COURT: Sustain your objection and deny your motion."
In Evans v. State, Ala.Cr.App., 338 So.2d 1033 (1976), this court recognized that there is no legal standard for gauging the prejudicial qualities of district attorney's remarks. There the court said, "Each case must be determined on its own merits." *Page 163 
In the present case, the remark by the prosecutor came at the close of his rebuttal to the defense attorney's closing argument. The comment appears to be totally irrelevant to the case at hand. See Starr Jobbing House v. May Hosiery Mills,207 Ala. 620, 93 So. 572 (1922). Because the district attorney remarked that the next case he was to prosecute involved a black victim, but nothing was said about a black defendant, we do not believe the statement was prejudicial to appellant. We view the district attorney's comment as a reminder that he would bring the murderer of a black man to justice as swiftly as he would pursue the killer of a white man.
After a close reading of the entire closing argument by both parties, we are convinced that the district attorney was replying to the argument previously made by the defense counsel. No mention of race was made in the first part of the district attorney's closing argument. However, our examination of the record shows that the defense attorney, in closing argument, made many references to race. From the record:
 "I asked you at the outset whether or not you could accord to Mrs. Wilder the same standard of justice that you would accord to a white person, even though she is a black person.
. . . .
 "I asked each of you at the outset whether or not the fact of the race or color of the attorneys or of the defendant would make any difference at all or enter into your deliberations in any sort of way.
. . . .
 "Keep in mind that you have vowed not to let community pressure enter into deliberations that you go to make back there at all because community pressures and considerations of race have no place in our judicial system.
. . . .
 "But I do not know that a white jury in Pickens County in 1979 can rise to the challenge. I do not know that. I just hope to God you can. But I do not know that. Perhaps I will know it before I leave.
. . . .
 "The State says, it implies that Mrs. Wilder is a troublemaker.
. . . .
 "Really, look. Mrs. Wilder sits in a courtroom right now on trial and the prosecution is white, the jury is white; and in fact everybody is white except Mrs. Wilder and her lawyers. And she has been in Pickens County 66 years. She wants somehow to kind of change that situation. She ought to want to change it. If you were black, you would want to change it.
. . . .
 "Black people do not run the Democratic Party or no other party in the State of Alabama. Ladies and Gentlemen, you know that. White people run the Democratic Party.
. . . .
 "Now, last year is not the only time that, that poor woman has been working in elections. That part of her — She had been at it a long, long time, I would be willing to wager you everything I have, which is not much, that in November of last year that poor woman worked hard and long and with absentee ballots to help elect Fob James that many of you all voted for. That is just as true as I understand it here. But while Governor James has gone in to be the Governor of this State, that poor woman sits here on trial. I dare say, I will wager everything I have got and I said that is not much, that when he ran, if he ran, that poor woman was out there with absentee ballots across this county. If he got elected, she helped.
 "But they did not prosecute her that time. If he runs again, seven days a week anywhere she can find to vote she is going to be trying. That is her.
 "The problem occurs, and that is why I will tell you to use your common sense. The problem occurs if some black candidate surfaces locally and wants to run for something. She is going to support him. She would be crazy if she did not. You would do it if you were in her position. That makes her in the minds of some a *Page 164 
troublemaker. It has come now to the point where they say she is even a criminal.
 "Did you hear the testimony of who brought these ballots to the Courthouse? It was not Mrs. Wilder; it was not even anybody black. It was a white man who helped successfully to elect one of your United States Senators, Howell Heflin.
. . . .
 ". . . You ought to find her not guilty because on the evidence, she is not. There is no criminal intent here. There is no fraud here. There is only a poor woman trying to help. That is all you've got. But there is this question of race and all that.
 "You and I know that there are people in this county, in every county out there, I would say in the boon docks, and they ain't all black. They have used her, reused her, and will use her again if they get the opportunity."
The following comments were made by the district attorney in rebuttal argument:
 "It does not make any difference to me how many white people in Pickens County think that Julia Wilder is an agitator. It does not make any difference to me how many people would like to talk to us about that.
. . . .
 "If anyone in this county who happens to be white were to commit a crime involving any black member of our society in this county, it would not make any difference to me how much pressure was applied not to prosecute that person simply because he or she was white.
. . . .
 "Now, a lot has been said about the standard of treatment for blacks, that the same standard of treatment should be applied. Conversely, we might say that the same duty to abide by the law should apply. And the same standard of compliance should apply, a privilege including responsibilities. And it is not enough to say when a law is violated that he or she is simply black or white and that is the end of it.
. . . .
 "Mr. Seay said that if your verdict is impartial, it must be not guilty. Now, Ladies and Gentlemen of the jury, it is more important to me that she get a fair trial in the county than that you find her guilty.
. . . .
 "And it is obvious that there is probably a lot of pressure on a lot of other people because there has not been many white folks in the courtroom at all this time. They would rather steer clear of the taint of having offended these folks. You know, they will all come and ask if somebody is being investigated, but they do not want the responsibility for whatever happens after that. And that is the way a lot of folks feel about you. They will say, you know, that `you really ought to convict her, but do not tell anybody that I said it to you.'"
We note that no objections were taken to any of the preceding quotes by either the defense or the prosecution.
Our examination of the closing arguments reveals what appears to be a pattern of racial references injected by the defense. The district attorney's remarks, including the remark objected to, were reply in kind to the defense attorney's arguments. The appellant cannot complain of the remarks by the district attorney when they were provoked by her defense counsel. Byrdv. State, 209 Ala. 65, 95 So. 655 (1923). See also, Seals v.State, 282 Ala. 586, 213 So.2d 645 (1968).
This court observed in Evans v. State, supra, that wide latitude should be given to the prosecuting attorney when he replies to an argument previously made by the defense counsel. The remarks complained of by the prosecutor were not error and were within the permissible limits of reply to the defense counsel.
 V
At the completion of the court's oral charge, the appellant objected to the trial court's instructions to the jury, claiming *Page 165 
that the trial court improperly stated the contentions of the State without stating the contentions of the appellant.
The trial court's charge must be considered as a whole; no part of it should be tested in isolation. Brooks v. State, Ala.Cr.App., 353 So.2d 1 (1977).
In the present case, the trial court named the State's contentions only in reference to its burden of proof. The contentions were prefaced with the following statement:
 Now, the State has the burden of satisfying you, the jury, from the evidence beyond a reasonable doubt as to each of the following matters or one of the two offenses contained in this statute."
The trial court then concluded that portion of the charge by stating the following:
 "As I have pointed out to you, the burden rests upon the State of Alabama to prove all of these allegations to your satisfaction beyond a reasonable doubt."
In Glover v. State, 21 Ala. App. 423, 426, 109 So. 125 (1926), the court observed:
 "In charging the jury, it is the duty of the judge to give the law applicable to all theories presented by the testimony, and, if he recapitulates the evidence on one side, to recapitulate it also on the other side, and not to indicate, by the matter or manner of the charge, what his own views are as to the effect of the testimony."
The foregoing portion of the court's oral instruction did not recapitulate the evidence for the State at the expense of the appellant. Nor did it comment on the effect of the evidence, or refer to what had or had not been proved. Wyman v. State,47 Ala. App. 643, 259 So.2d 849 (1972). The trial court merely stated the burden of proof on each element of the offense that must be met by the State. Therefore, it is our judgment that the trial court properly instructed the jury. See Hill'sAdministrator v. Nichols, 50 Ala. 336 (1874).
We have searched the record for error prejudicial to appellant and have found none; therefore, the judgment of conviction by the Pickens Circuit Court is affirmed.
AFFIRMED.
All the Judges concur.
[1] See attached appendix.
[2] The State introduced thirty-nine absentee ballots and thirty-nine applications in this case.
 APPENDIX Pickens County
[EDITORS' NOTE: LOGO IS ELECTRONICALLY NON-TRANSFERRABLE.]
 DEMOCRATIC PARTY OFFICIAL ABSENTEE BALLOT PRIMARY RUN-OFF ELECTION SEPTEMBER 26, 1978
INSTRUCTIONS: To vote for any candidate make a cross (X) in the square in the appropriate column, according to your choice. *Page 166 
---------------------------------------------------------------FOR DELEGATE TO NATIONAL FOR STATE REPRESENTATIVE, PARTY CONFERENCE, 4th DISTRICT 88 — CONGRESSIONAL DISTRICT, (Vote for One) PLACE NO. 1 — (Vote for One) ------------------------------ — ---------------------------- [ ] GEORGE CLARK [X] BARBARA BOBO ------------------------------ — ---------------------------- [X] SPIVER W. GORDON [ ] JACKIE DRAKE POWELL ------------------------------ — ---------------------------- FOR STATE REPRESENTATIVE,FOR GOVERNOR — (Vote for One) DISTRICT 89 —
— ---------------------------- (Vote for One) ------------------------------ [X] BILL BAXLEY [ ] HOOD DYER — ---------------------------- ------------------------------ [ ] FOB JAMES [ ] EARL MITCHELL — ---------------------------- ------------------------------FOR LIEUTENANT GOVERNOR — FOR SECRETARY OF STATE —
(Vote for One) (Vote for One)
— ---------------------------- ------------------------------ [X] BERT BANK [ ] MARTHA ADAMS — ---------------------------- ------------------------------ [ ] GEORGE McMILLAN [X] DON SIEGELMAN — ---------------------------- ------------------------------FOR UNITED STATES SENATOR, FOR STATE TREASURER — FULL TERM, PLACE NO. 1 — (Vote for One) (Vote for One) ------------------------------ — ---------------------------- [ ] ANNIE LAURIE GUNTER [ ] WALTER FLOWERS ------------------------------ — ---------------------------- [X] JUANITA W. McDANIEL [X] HOWELL HEFLIN ------------------------------ — ---------------------------- FOR PUBLIC SERVICE COMMISSION, FOR UNITED STATES SENATOR, PLACE NO. 1 — UNEXPIRED TERM, PLACE NO. 2 (Vote for One) — (Vote for One) ------------------------------ — ---------------------------- [X] CHARLES GADDY [ ] MRS. JIM ALLEN ------------------------------ — ---------------------------- [ ] PETE MATHEWS [X] DONALD W. STEWART ------------------------------ — ---------------------------- FOR COUNTY REVENUE FOR ATTORNEY GENERAL — COMMISSIONER —
(Vote for One) (Vote for One) — ---------------------------- ------------------------------ [X] JOE FINE [X] PHIL M. BAKER — ---------------------------- ------------------------------ [ ] CHARLIE GRADDICK [ ] KITTIE COOPER — ---------------------------- ------------------------------ "By casting this ballot I do FOR STATE DEMOCRATIC EXECUTIVE
pledge myself to abide by the COMMITTEE, DISTRICT NO. 88 Election —
result of this Primary (Vote for One) and to aid and support all the ------------------------------ Nominees thereof in the ensuing [X] JERRY BROWN General Election." ------------------------------ [ ] RONALD E. CLEMENTS ------------------------------ ---------------------------------------------------------------
 AFFIDAVIT FOR ABSENTEE VOTER
"State of Alabama
County of Pictus
"Before me, the undersigned authority, personally appearedSophia Spain, who is known (or made known) to me and who, being first duly sworn, deposes and says: I am a bona fide resident and qualified elector of ____________________ precinct or district in ______________________ County, Alabama or that I was a bona fide resident and qualified elector of 21 precinct or district until my removal therefrom on the ____________ day of _____________ , 1978 a date not more than thirty days before the election day, and but for such removal I still satisfy the Alabama registration requirements. I have not heretofore voted in the election to be held on September 26, 1978, and I am entitled to vote therein; but, I will be away from the county of my residence (or former residence) or unable to go to the polls on such day. Therefore I have marked the foregoing absentee ballot and hereby declare the same to be my ballot in said election. Sophia Spain I am a member of the Democratic Party and subscribe to all conditions and qualifications laid down by that party's committee as a requisite for participation in the election.
Sophia Spain (Signature or mark of voter.)
"Sworn to and subscribed before me this 23rd day of Sept., 1978, I certify that the affiant is known (or made known) to me to be the identical party he claims to be.
_______________________ (Signature of Official)
_______________________ (Title of Official)." *Page 167 
Form 1975 A.B. 1
 APPLICATION FOR ABSENTEE BALLOT
______________________, 1978
To HON. __________________
Register ______________ County Pickens Alabama
Dear Sir:
I will be unable to vote at my regular polling place because of my absence from the county on 9-2678, 197___. I hereby make application for a [X] Democrat Republican (you must specify) absentee ballot that I may vote in the election to be held on that date. I also make application for absentee ballot for Primary Run-Off Election if necessary. Yes No 
Applicant's Name Sophia Spain
Age 76 Sex Female
Address 532 — 10th Ave NW
Precinct in which I last voted 21
Mail ballot to address __________________________________ Signed X
If signed by mark the name of the witness must be signed hereon.
Witness signature Julia Wilder
This application may be handed by the applicant to the register or forwarded to him by United States Mail.