IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs May 2, 2006

## STATE OF TENNESSEE v. ANTONIO ARNOLD

**Direct Appeal from the Criminal Court for Shelby County**
**No. 02-07507      W. Otis Higgs, Jr., Judge**

_____

**No. W2005-00119-CCA-R3-CD  - Filed August 25, 2006**

_____

The defendant, Antonio Arnold, was convicted by a Shelby County jury of felony murder, voluntary manslaughter, aggravated burglary, and aggravated assault. On appeal, he challenges the sufficiency of the convicting evidence and four evidentiary rulings of the trial court. Upon our review of the record and the parties' briefs, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

J.C. McLIN, J., delivered the opinion of the court, in which THOMAS T. WOODALL and JOHN EVERETT WILLIAMS, JJ., joined.

Phyllis Aluko (on appeal), Assistant Public Defender, Memphis, Tennessee, and Larry Nance (at trial), Memphis, Tennessee, for the appellant, Antonio Arnold.

Paul G. Summers, Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; William L. Gibbons, District Attorney General; and David Zak and Patience Branham, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**BACKGROUND**

On September 19, 2002, the defendant was indicted for first-degree murder, felony murder, aggravated burglary, and aggravated assault. The charges arose out of the defendant's entry into Sandra Alexander's home in the morning hours of October 21, 2001, and his assaulting Ms. Alexander and shooting her boyfriend, Gary Colbert. The record on appeal contains four volumes of trial transcript. As such, we limit our recitation of the testimony relevant to the defendant's allegations in this appeal.

At trial, Diana Sample, Ms. Alexander's mother, testified that she talked with the defendant about two weeks before the offenses giving rise to this case. Ms. Sample recalled that the defendant

showed up at her house and used her phone to call Ms. Alexander. According to Ms. Sample, the defendant told Ms. Alexander, "I'm going to kill your B.A. on your birthday. . . . I want your momma to know," and then left. Ms. Sample testified that she called Ms. Alexander back and told her "we need to go downtown and put a peace bond on him because he might hurt [you]." On redirect examination, Ms. Sample testified that after the break-in and shooting, Ms. Alexander was withdrawn, had a nervous breakdown, and tried to commit suicide.

Ms. Alexander testified that she used to date the defendant and they had a child together. She recalled that around 6 a.m. on October 21, 2001, she got up to go to the bathroom when she noticed her bedroom door was unlocked. As she opened the door, the defendant burst into her room, pushed her in the face, and said he was going to kill her. Ms. Alexander remembered that the defendant was wearing a utility belt containing an axe, gun, and handcuffs when he entered the room. The defendant ordered her to put handcuffs on Colbert but she was not able to latch them. As she pled with the defendant not to hurt Colbert, Colbert got up off the bed and he and the defendant began tussling with the gun and the gun went off. Ms. Alexander testified that she ran for help after the gun went off.

On cross-examination, Ms. Alexander testified that Colbert normally carried a silver-gray gun with a broken handle, but she did not see him with a gun the morning of the incident. Ms. Alexander reiterated that the last thing she saw as she ran out of her bedroom was Colbert and the defendant tussling with a black gun that the defendant had pulled out.

Cassandra Cooper, Ms. Alexander's oldest child, testified that she was sleeping in her bedroom on October 21, 2001, when she was awakened by "[a] lot of noise and commotion, [and] arguing." She recalled that she heard her mother's, Colbert's, and the defendant's voices, so she called 911 "[b]ecause [the defendant] wasn't supposed to be in the house." Cassandra testified that she ran outside and hid in the bushes. A short while later, Cassandra saw Ms. Alexander run out of the house and down the street. Cassandra testified that the defendant ran out of the house to his car that was parked next door, then went to the side of the house and shot at a window. Cassandra explained that she did not see the defendant take the shot, but she heard glass break. Cassandra testified that when the defendant came out of the house he was holding something to his side that she thought was a gun.

Tiara Cooper, Ms. Alexander's second-oldest child, testified that she awoke to the sound of gunshots on October 21, 2001. Tiara testified that she got out of bed in time to see the defendant exit the house. She remembered seeing a lot of blood and Colbert on the kitchen floor breathing heavily.

Jasmine Cooper, Ms. Alexander's third-oldest child, testified that she was asleep on October 21, 2001, when she was awakened by the sound of glass shattering and a gunshot. Jasmine testified that she saw her mom and Tiara running and her mom was arguing with somebody. Jasmine testified that the only voices she recognized were her mom's and Colbert's.

Memphis Police Officer Russell Woolley testified that he received a disturbance call on October 21, 2001, from Ms. Alexander's residence. Officer Woolley testified that as he approached

the residence, a young girl jumped out from behind some bushes and said, "don't go inside. Don't go inside. He's in there. He'll kill you." Officer Woolley recalled that upon entering the house he saw a black ski mask on the floor and he smelled fresh gunpowder, indicating that a weapon had recently been discharged. During his canvas of the house, Officer Woolley saw a barely-alive naked male lying face down on the kitchen floor with a gun in his hand. Officer Woolley testified that his partner recovered the gun for safety reasons and placed it on top of the china cabinet.

In conducting a further search of the house, Officer Woolley found a magazine containing nine-millimeter bullets, loose ammunition, a wallet, a blue bag, a black bag, and a pair of handcuffs near the bed in the master bedroom. Officer Woolley also noticed a wooden-handled hatchet, a "flexie" cuff, and a spent bullet round in the corner of the master bedroom. After viewing a crime-scene photograph of Colbert, Officer Woolley noted that Colbert had what appeared to be bite marks on his left forearm, left wrist, and right wrist. Officer Woolley testified that Colbert died while he was on the scene. Outside, Officer Woolley noticed a white car parked in front of the house next door.

Memphis Police Officer Thomas Avery testified similarly to Officer Woolley. Additionally, Officer Avery elaborated that he moved the gun from Colbert's hand because he was shaking and the gun might discharge.

Memphis Police Officer Patricia Turnmire identified photographs of the evidence she collected from the scene. Among other things, Officer Turnmire recovered a .380 caliber spent casing, a .380 caliber live round, two nine-millimeter clips, a .380 Lorrison semi-automatic handgun loaded with a round jammed into the chamber, .380 caliber ammunition, a bloody hatchet, and bloody handcuffs. On cross-examination, Officer Turnmire admitted that she did not find a nine-millimeter weapon or any nine-millimeter spent casings at the scene. Lastly, Officer Turnmire noted that the .380 Lorrison handgun had a silver barrel and a broken black handle.

Lieutenant Anthony Craig of the Memphis Police Department testified that he was one of the homicide officers assigned to investigate the case. Lieutenant Craig recalled that it appeared that the suspect gained entry into the home through an open window or had pried open a window. Thereafter, the suspect entered a bedroom, a struggle ensued, and shots were fired. Lieutenant Craig testified that Ms. Alexander identified Colbert as the victim and the defendant as the possible suspect. Lieutenant Craig further testified that the defendant's father showed up at the scene and indicated that the defendant had written some type of a list with Ms. Alexander's name on it.

Lieutenant Craig recalled that the defendant's abandoned vehicle was towed to the storage lot where its contents were inventoried. In the vehicle, Lieutenant Craig found a green and black duffle bag, "one stick, one cassette tape, duck tape, garbage bag, plastic, ski mask, flexie cuffs, nine millimeter ammunition, gray notebook, pagers, box cutters, screwdriver, and blue bandana." Lieutenant Craig testified that he listened to the cassette tape and it contained two songs, then a male voice that said he was Captain Smith and he was on a mission. The speaker on the tape also referred to himself as a convicted felon. Lieutenant Craig was able to identify the defendant as the speaker.

According to Lieutenant Craig, he did not formally interview the defendant, but the defendant spontaneously claimed that he was Captain Smith with the Marine Corps and he was "coming back from a highly volatile mission, and . . . he had encountered the enemy in which he had employed the rules of engagement. . . . That at the time he took the enemy out. It was a female involved with the enemy at which time he . . . could not . . . eliminate her." Lieutenant Craig stated that he believed the defendant was "faking it."

Medical Examiner, Dr. O.C. Smith, testified that he performed the autopsy on Colbert and determined that the cause of death was multiple gunshot wounds. According to Dr. Smith, Colbert had "three areas that are injured; the right thigh, the scrotum, and the left thigh. And the way that the bullet holes are aligned and the wound tracks are aligned, it is possible for one bullet to have produced all three areas of injury." Dr. Smith testified that Colbert also had abrasions on both his wrists, and he had what appeared to be a bite mark on his left forearm. Dr. Smith said that he could not definitively determine whether Colbert had defensive wounds, but he could tell that Colbert had been in a struggle near the time of death.

On cross-examination, Dr. Smith admitted that he did not recover any bullet fragments from Colbert's body so he was not able to compare Colbert's injuries with any sort of weapon. Dr. Smith estimated that Colbert's wounds were caused by a medium caliber weapon such as "a 35, a nine millimeter or a .38," but he could not say for certain which caliber bullet caused the wounds.

Tamala Arnold, the defendant's sister, testified that the defendant lived with her in October of 2001. Ms. Arnold recalled seeing the defendant with papers showing that he had taken out a loan to pay off Ms. Alexander's loan on her house. On cross-examination, Ms. Arnold admitted that she knew about Ms. Alexander's order of protection against her brother, yet she knew they had seen each other on occasion. Ms. Arnold also admitted that the defendant was a convicted felon.

Adrian Arnold, the defendant's brother, testified that he was at Ms. Alexander's house along with his father shortly after the shooting, and he never heard his father mention anything about a list. Mr. Arnold recalled that one of the officers asked him if he had ever seen a list and he said no. Mr. Arnold further recalled that he saw the defendant the following day and he was acting "[v]ery out of the ordinary," like "he was in a military training doing some kind of business."

The jury convicted the defendant of felony murder, voluntary manslaughter, aggravated burglary, and aggravated assault. The trial court sentenced the defendant to ten years for the aggravated burglary conviction and ten years for the aggravated assault conviction. The court then merged the defendant's voluntary manslaughter conviction into his felony murder conviction and sentenced him to an effective sentence of life imprisonment.

## ANALYSIS

### I. Sufficiency

The defendant first challenges the sufficiency of the convicting evidence. Specifically, he argues that the state presented insufficient proof that he shot Colbert, a requirement for his felony murder and voluntary manslaughter convictions. Additionally, he argues that the state failed to prove that he intentionally committed the aggravated burglary. He does not challenge his conviction for aggravated assault.

Our review begins with the well-established rule that once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). Therefore, on appeal, the convicted defendant has the burden of demonstrating to this court why the evidence will not support the jury's verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000); *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). To meet this burden, the defendant must establish that no "rational trier of fact" could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Evans*, 108 S.W.3d 231, 236 (Tenn. 2003); Tenn. R. App. P. 13(e). In contrast, the jury's verdict approved by the trial judge accredits the state's witnesses and resolves all conflicts in favor of the state. *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). The state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. *Carruthers*, 35 S.W.3d at 558; *Tuggle*, 639 S.W.2d at 914. Questions concerning the credibility of the witnesses, conflicts in trial testimony, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). We do not attempt to re-weigh or re-evaluate the evidence. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). Likewise, we do not replace the jury's inferences drawn from the circumstantial evidence with our own inferences. *Id.*

A person commits aggravated burglary when he or she enters a habitation without the effective consent of the owner and "commits or attempts to commit a felony, theft or assault" or enters with the "intent to commit a felony, theft or assault." Tenn. Code Ann § 39-14-402(a), -403(a). Assault is defined as intentionally, knowingly, or recklessly causing bodily injury to another or causing another to reasonably fear imminent bodily injury. *See id.* § 39-13-101(a). To obtain a conviction for felony murder in this case, the state had to prove the defendant killed the victim in the perpetration of or attempted perpetration of a burglary. *Id.* § 39-13-202(a)(2). Voluntary manslaughter is the "intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." *Id.* § 39-13-211(a).

In the light most favorable to the state, the record reflects that the defendant did not have permission to enter Ms. Alexander's house. Ms. Alexander testified that she had an order of protection against the defendant. Cassandra, Ms. Alexander's daughter, testified that the defendant was not supposed to be in the house. The defendant's method of entering the house at night surreptitiously through a window also indicates he did not have permission to enter. Any testimony regarding the defendant being delusional the day of the offense or him having an ownership interest in the house was assessed and discredited by the jury.

The record also reflects that the defendant entered Ms. Alexander's house with the intent to commit and did commit an assault. Ms. Alexander testified that the defendant unexpectedly burst into her bedroom armed with an axe, gun, and handcuffs. He pushed her in the face as he entered the bedroom and said he was going to kill her, and ordered her to handcuff Colbert. In his car nearby, the defendant had a duffle bag with an axe handle, garbage bags, duct tape, a ski mask, ammunition, box cutters, and a bandana – items indicative of a felonious intent.

Furthermore, the record indicates that the defendant shot Colbert. Ms. Alexander testified that she witnessed the defendant and Colbert tussling over the defendant's gun and heard the gun go off. Dr. Smith testified that Colbert died from close-range gunshot wounds. Cassandra testified that she saw the defendant leaving the house with what appeared to be a gun. As stated previously, "We do not replace the jury's inferences drawn from the circumstantial evidence with our own inferences." *Reid*, 91 S.W.3d at 277.

Therefore, from this evidence, a reasonable jury could find that the defendant entered Ms. Alexander's house uninvited with the intent to commit an assault and indeed did commit an assault inside; thus, meeting the requirements for aggravated burglary. Additionally, a reasonable jury could find from the circumstantial evidence that the defendant shot and killed Colbert; thus, meeting the requirements for felony murder and voluntary manslaughter.

## II. Evidentiary Rulings

Second, the defendant challenges four of the trial court's evidentiary rulings. Initially, we note the admissibility, relevancy, and competency of evidence are matters entrusted to the sound discretion of the trial court. *State v. Rice*, 184 S.W.3d 646, 682 (Tenn. 2006). With that principle in mind, we review the trial court's evidentiary rulings for abuse of discretion. *Id.*; *see State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997); *State v. Gray*, 960 S.W.2d 598, 606 (Tenn. Crim. App. 1997).

### A. Testimony Regarding Ms. Alexander's Nervous Breakdown

The defendant argues that the trial court erred in allowing Ms. Sample to testify on redirect examination that Ms. Alexander had a nervous breakdown after the shooting. He contends that Ms. Sample's testimony fell outside the scope of the issues raised on cross-examination and elicited sympathy for Ms. Alexander.

While the scope of redirect examination is limited to matters brought out during cross-examination, under some circumstances new matters may be introduced. *See Bouchard v. State*, 554 S.W.2d 654, 658-59 (Tenn. Crim. App. 1977). "[I]t is within the discretion of the trial court to allow a party on redirect examination to supply testimony omitted by oversight, or to clarify testimony given on direct examination, or, where the facts thus developed are not inconsistent with his previous answers to ask a witness to expand his testimony." *State v. Barnard*, 899 S.W.2d 617, 624 (Tenn. Crim. App. 1994); *see also State v. John Allen Chapman*, No. 01C01-9604-CC-00137, 1997 WL

602944, at *17 (Tenn. Crim. App., at Nashville, Sept. 30, 1997), *perm. app. denied* (Tenn. May 11, 1998).

Here, the state informed the trial court that it wanted to ask Ms. Sample an omitted question, and the trial court allowed the line of questioning and gave the defendant the opportunity to recross-examine Ms. Sample about her testimony. We do not see any error in the trial court allowing Ms. Sample to testify beyond the scope of cross-examination, but we fail to see the relevancy of the state's line of questioning. Ms. Sample's testimony concerning Ms. Alexander's mental state *after* the incident did not help establish any element of the offenses of which the defendant was charged, nor did it make the existence of any fact of consequence to the determination of the action more or less probable. *See* Tenn. R. Evid. 401. Nonetheless, there is no indication that the jury rested its verdict on Ms. Sample's testimony concerning the impact of the offenses on Ms. Alexander, and, in light of the overwhelming proof at trial, any error was harmless. Tenn. R. Crim. P. 52(a); *see Momon v. State*, 18 S.W.3d 152, 168 (Tenn. 1999).

## B. Testimony Regarding the Restraining Order

The defendant argues that the trial court erred in allowing "the state to introduce into evidence hearsay statements of Ms. Diana Sample concerning the need to obtain a protective order against the [defendant] for her daughter, Sandra Alexander." He also asserts that Ms. Sample's statement prejudiced him by raising an inference of prior criminal conduct. The defendant objects to the following testimony:

State: Now, what exactly did you hear him say on the phone? Who was he going to kill?

Ms. Sample: My daughter, Sandra Alexander. He used my phone.

State: And what did he do after he made this accusation?

Ms. Sample: I told him he didn't want to do that because I would hurt him about my child. He got in his car and pulled off and then I called her back and told her we need to go downtown—

Defense: Object to the hearsay, if Your Honor please.

State: If you'd just stick to what—

Court: Well, she's just saying what she said. I'm going to overrule that objection.

State: Go on.

-7-

Ms. Sample: I called my daughter back *and told her we need to go downtown and put a peace bond on him because he might hurt her.* And we did that.

The Tennessee Rules of Evidence define hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). "The primary justification for the exclusion of hearsay is the lack of any opportunity for the adversary to cross-examine the absent declarant whose out-of-court statement is introduced into evidence." *Anderson v. United States*, 417 U.S. 211, 220 (1974).

To begin, we are not convinced that Ms. Sample's statement was offered to prove the truth of the matter asserted – that Ms. Alexander sought a restraining order against the defendant. The fact that Ms. Alexander obtained a restraining order was proven by Ms. Alexander's own testimony. In addition, the principle behind the hearsay rule is not applicable here because Ms. Sample was a witness and therefore available for cross-examination by the defendant. Furthermore, any error would be harmless error because of the overwhelming evidence apart from Ms. Sample's testimony that the defendant did not have a legal right to enter Ms. Alexander's home. Tenn. R. Crim. P. 52(a).

### C. Testimony about the List

The defendant argues that the trial court erred in allowing Officer Craig to testify concerning the defendant's father's statement that the defendant had a list of people he intended to kill, which included Ms. Alexander.

Initially, we note that the majority of Officer Craig's testimony regarding the defendant's father's statement was actually heard *outside* the jury's presence. Therefore, the jury had limited exposure to this testimony. We also note that in Count 1 the defendant was charged with premeditated first-degree murder, meaning the state had to prove the element of premeditation. An alleged "hit list" would have been instrumental in the state's effort to prove premeditation. However, as indicated by its verdict, the jury evidently did not consider or give much weight to the testimony regarding this list, as the defendant was found guilty of voluntary manslaughter instead of premeditated first-degree murder. The offenses of which the defendant was convicted, voluntary manslaughter, felony murder, aggravated burglary, and aggravated assault, all require mental states other than "premeditated." Therefore, any error was harmless in light of the jury's verdict. *Id.*; *see Momon*, 18 S.W.3d at 168.

### D. Un-redacted Tape

The defendant argues that trial court erred in failing to redact the tape he made that included his statement that he was a convicted felon and for failing to give a cautionary instruction following the tape's admission. The defendant avers that he was unfairly prejudiced by the jury learning that he was a convicted felon.

Following our review, we note first that the tape was properly admitted as evidence of the defendant's premeditation. However, the better practice would have been to redact the tape prior to trial to remove the defendant's statement concerning his convicted felon status. *See State v. Juan Alfonzo Hill*, No. 03C01-9710-CR-00441, 1999 WL 222370, at \*2 (Tenn. Crim. App., at Knoxville, Apr. 8, 1999), *perm. app. denied* (Tenn. Sept. 20, 1999). In the alternative, the trial court should have given a cautionary instruction. Nonetheless, the error was harmless. At trial, the defense called the defendant's sister, who admitted on cross-examination that the defendant was a convicted felon. Thus, the jury learned of the defendant's felon status through his sister's testimony. We fail to see how the un-redacted tape substantially affected the outcome of the trial. Tenn. R. Crim. P. 52(a).

## CONCLUSION

Based on the aforementioned reasoning and authorities, and following our review of the record and the parties briefs, we affirm the judgments of the trial court.

_____
J.C. McLIN, JUDGE