. HAMILTON, Circuit Judge,
joined by EASTERBROOK and SYKES, Circuit Judges,
dissenting.
The Indiana courts excluded ,as evidence an unsworn, ex parte interview of a nine-year-old witness who later disclaimed any memory of the interview. That decision did not violate petitioner Kubsch’s constitutional rights. The exclusion certainly was not an unreasonable application of “clearly established Federal law, as determined by the Supreme Court of the United States.” 28 U.S.C. § 2254(d)(1).
To overturn Kubsch’s three murder convictions, the en banc majority has crafted a new rule so narrow and case-specific as to be good apparently only for this case: “Only if all of the factors the Court has specified, and we have described, come together must the evidence rule yield.” Ante at 862. That qualification is a red flag signaling a decision in conflict with § 2254(d)(1). True, the majority has built its argument from texts in the volumes of the United States Reports, working from Chambers v. Mississippi, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), and its progeny. But that line of cases requires careful balancing of many case-specific factors, which the majority says must all point in the same direction for a rule of evidence to yield. I disagree with the majority’s new, case-specific rule, but the decisive point in this habeas case is that that new rule is not compelled by those precedents. Fair-minded judges can disagree with it.
While habeas relief does not require “virtual identity” between the current case and a Supreme Court decision, the problem here actually runs much deeper. The majority has not identified any case in any American jurisdiction where such an un-sworn, ex parte witness statement would even be admissible as substantive evidence, let alone that the state courts’ exclusion of the statement here violated clearly established constitutional law. I respectfully dissent.
The Supreme Court repeatedly reminds the lower federal courts in habeas corpus cases that we must allow state court decisions to stand unless “the state court’s ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.” Harrington v. Richter, 562 U.S. 86, *871 103, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011). Accord, e.g., Woods v. Etherton, 578 U.S. -, 136 S.Ct. 1149, 194 L.Ed.2d 333 (2016) (summary reversal; reasonable judges could disagree on whether appellate counsel was ineffective); White v. Wheeler, 577 U.S. -, 136 S.Ct. 456, 193 L.Ed.2d 384 (2015) (summary reversal; reasonable judges could disagree on whether judge properly excused juror for cause); Lopez v. Smith, 574 U.S. -, 135 S.Ct. 1, 190 L.Ed.2d 1 (2014) (summary reversal; Supreme Court case law did not clearly establish right to relief).
The majority’s narrow rule conflicts with both specific rules limiting hearsay evidence and the general principles that underlie those rules. Most hearsay is inadmissible because it is less reliable than live testimony and therefore less relevant in the search for truth. See Anderson v. United States, 417 U.S. 211, 220, 94 S.Ct. 2253, 41 L.Ed.2d 20 (1974) (“The primary justification for the exclusion of hearsay is the lack of any opportunity for the adversary to cross-examine the absent declarant whose out-of-court statement is introduced into evidence.”). As explained below, the Chambers ruling itself was narrow and case-specific. The broader principles that underlie that ruling give broad deference to authors of rules of evidence, but allow for rare constitutional exceptions to those rules under compelling circumstances. The guidance from those principles is general, though, and does not compel a ruling in a particular case like this one.
Note that the Supreme Court itself has never relied on the Chambers line of cases to grant habeas relief. That fact aloné suggests that the majority’s result is not dictated by Supreme Court precedent. Instead, the Court has summarily reversed a grant of habeas relief where the court of appeals, like the majority here, read Chambers too broadly. Nevada v. Jackson, 569 U.S. -, 133 S.Ct. 1990, 186 L.Ed.2d 62 (2013). We should affirm the denial of relief here.
On September 18, 1998, petitioner Wayne Kubsch murdered' his wife Beth, her ex-husband Rick Milewski, ahd then-son Aaron Milewski; Beth had been stabbed eleven times. Her face and head were covered with duct tape. Her hands and feet were also bound with duct tape. Aaron and Rick had also been stabbed, and each had been shot in his mouth.
The case against Kubsch was circumstantial but powerful. He had motive and opportunity. Numerous items of evidence pointed in his direction. The murders were committed in the basement of Kubsch’s home, which was locked after the murders. The only people who had keys were Kubsch, Beth, and her other son who found Rick’s and Aaron’s bodies. The murders were committed with a knife from the kitchen. The duct tape binding Beth matched a tape package in Kubsch’s car. Cloth fiber from the tape roll matched the carpet of Kubsch’s car. A receipt for purchase of the duct tape, dated three days before the murders, was also found in Kubsch’s car. A kitchen pan had Beth’s blood on it. It is not plausible that the killer was a stranger who counted’ on tools found in the Kubsch home—the knife, the pan, and the duct tape—to carry out the murders.
In addition to this physical evidence, “most damning to Kubsch was a series of lies, inexplicable omissions, and inconsistencies in what Kubsch told the police and later testified on the witness stand, and these statements—in conjunction with a few pieces of circumstantial evidence—-are what almost assuredly got Kubsch convicted.” Kubsch v. Superintendent, No. 3:11CV42-PPS, 2013 WL 6229136, at *1 (N.D. Ind. Dec. 2, 2013). Kubsch spoke with the police a few hours after the mur *872 ders. At that time, the bodies of Aaron and Rick had been discovered, but Beth was still missing. Kubsch was calm. He expressed no concern about his missing wife’s safety. Before her body was found, he told a friend and his wife that Beth was “gone,” which both understood to mean that Beth was dead. Even the police did not know- that yet. And even if Kubsch’s use of the word “gone” could be explained away as ambiguous, Kubsch also told his friend that Aaron and Rick had been stabbed and shot.. Authorities did not find the gunshot wounds until autopsies were conducted the next day.
As the, district court summarized, Kubsch’s account of his movements and communications the day of the murders changed repeatedly. Every time the police confronted him, with new evidence contradicting his earlier stories, he concocted new versions. (More detailed accounts of those changes and contradictions can be found in the panel opinion, Kubsch v. Neal, 800 F.3d 783, 790-92 (7th Cir. 2015), and in the district court’s careful opinion, Kubsch, 2013 WL 6229136, at *5-6,)
The jury convicted Kubsch of all three murders and recommended the death penalty. The - judge, sentenced Kubsch to death. . The Indiana Supreme Court affirmed on direct appeal. The state courts denied post-conviction relief; the district court denied habeas relief, as did the appellate panel.
The en banc majority now reverses the convictions and .orders a /new trial for Kubsch based solely on the exclusion of Amanda Buck’s recorded interview with the police four days after the murders. Amanda’s statement was exculpatory. If the statement were factually accurate, then Kubsch would be innocent. The majority agrees that Amanda’s statement was not admissible under Indiana evidence law. But Amanda’s recorded interview is the only available information tending to corroborate Kubsch’s claim of innocence. The majority finds not only that its exclusion deprived him of his right to due process of law, but also that no fair-minded judge could disagree on the basis óf U.S. Supreme Court decisions.
I find no error in the exclusion of Amanda’s statement, let alone a violation of constitutional law clearly established by Supreme Court decisions. Chambers and its progeny do not show that the state court’s decision was “beyond any possibility for fair-minded disagreement,” Richter, 562 U.S. at 103,131 S.Ct. 770. Amanda’s statement was not under oath, not subject to cross-examination, and not corroborated.[1]
Chambers itself is the Supreme Court case closest to this one, but the differences are so pronounced and important that they belie the majority’s claim that Chambers clearly required admission of Amanda’s statement. The issue in Chambers was the admissibility of witness McDonald’s four confessions to the fatal shooting of Officer Aaron Liberty. One confession was written and under oath. The other three were spontaneous statements to three different friends. McDonald testified at trial and was available for cross-examination. McDonald’s confessions were also corroborated by other witnesses. One testified that he saw McDonald fire the fatal shot. Another saw McDonald with a gun immediately after the fatal shot, and a third knew that McDonald owned the type of gun used in the murder, The state court had stopped Chambers from impeaching McDonald, invoking the old “voucher rule” that barred *873 a party from impeaching his own witness. McDonald’s confessions to his three friends were excluded as hearsay.
The Supreme Court reversed Chambers’ convictions, holding that the combined effect of the voucher and hearsay rules violated Chambers’ right to due process. 410 U.S. at 302-03, 93 S.Ct. 1038. The Court noted that declarations against interest have long been treated as sufficiently reliable to qualify for an exception to the hearsay rule. Id. at 298-99, 93 S.Ct. 1038. The Court also found that the excluded confessions “bore persuasive assurances of trustworthiness” that brought them “well within the basic rationale of the excéption for declarations against interest” and were “critical to Chambers’ defense.” Id: at 302, 93 S.Ct-. 1038. The Court concluded: “In these circumstances, where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice.” Id. The combination of the limits on impeachment and exclusion of the confessions led the Court to hold that “under the facts and circumstances of this case the rulings of the trial court deprived Chambers of a fair trial.” Id. at 303, 93 S.Ct. 1038.
That narrow “facts and circumstances” language indicates that “Chambers was an exercise in highly case-specific error correction.” Montana v. Egelhoff, 518 U.S. 37, 52, 116 S.Ct. 2013, 135 L.Ed.2d 361 (1996) (plurality opinion of Scalia, J.). There was ⅛ deeper principle at work, but the principle is too general to mandate habeas relief in this case. The principle was best articulated in Rock v. Arkansas: rules of evidence restricting the right to present a defense cannot be “arbitrary or disproportionate to the purposes they are designed to serve.” 483 U.S. 44, 56, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987). The-Court later explained that it has struck down as “arbitrary” those restrictions that “excluded important defense evidence but that did not serve any legitimate interests.” Holmes v. South Carolina, 547 U.S. 319, 325, 126 S.Ct. 1727, 164 L.Ed.2d 503 (2006).
This general standard does not readily decide individual cases, let alone dictate their results so clearly as to support habe-as relief. The Chambers line of cases also recognizes that “‘state and federal rule-makers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials.’ ” Jackson, 133 S.Ct. at 1992 (summary reversal of habeas relief), quoting Holmes, 547 U.S. at 324, 126 S.Ct. 1727, .quoting in turn United States v. Scheffer, 523 U.S. 303, 308, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998).
While-the majority correctly identifies some similarities between Chambers and this case, there are critical differences on points the Court emphasized in Chambers itself. These differences should foreclose habeas relief. Even if one can look past the Court’s reliance on the combined effects of the voucher and hearsay rules in Chambers, see 410 U.S. at 302-03, 93 S.Ct. 1038, the reliable out-of-court confessions of witness McDonald are readily distinguishable from Amanda’s recorded statement here. Amanda’s statement lacked meaningful corroboration, and she was not subject to cross-examination about her statement.
The unusual extent of corroboration was central to the reasoning in Chambers. McDonald’s four independent confessions corroborated each other. They were also corroborated by the testimony of other witnesses: one who saw McDonald shoot the officer, another who saw him with a gun immediately afterward, and yet another who knew he had owned a gun liké the murder weapon and later replaced it with another similar gun. Id. at 293 n.5, 300, 93 S.Ct. 1038.
*874 In this case, there is essentially no corroboration of Amanda’s statement on the critical point, which is whether Aaron and Rick were at their home alive and well between 3:30 and 3:45 p.m. on the day they were murdered. While Amanda’s mother initially indicated that she also saw Aaron at home that afternoon, she later corrected her statement. It is easy to understand how Amanda and her mother could have mixed up their dates. The sight of a neighbor at his house is not the kind of unusual event likely to stick clearly in one’s memory. In any event, the mother’s statement was never even offered as evidence. It also could not have been admitted as substantive evidence to corroborate Amanda’s statemént. The absence of meaningful corroboration of Amanda’s recorded statement distinguishes this case from Chambers. See also Rice v. McCann, 339 F.3d 546, 550 (7th Cir. 2003) (affirming denial of habeas relief in part because state court found hearsay was not corroborated).
The availability of cross-examination was also central to Chambers: “if there was any question about the truthfulness of the extrajudicial statements, McDonald was present in the courtroom and was under oath. He could have been cross-examined by the State, and his demeanor and responses weighed by the jury.” 410 U.S. at 301, 93 S.Ct. 1038;
In this respect, as well, this case is quite different. Unlike the declarant in Chambers, Amanda was unavailable for cross-examination. She took the stand at trial briefly but testified that she did not remember being interviewed by the police or what she said to them. “A declarant is considered to be unavailable as a witness if the declarant ... testifies to not remembering the subject raatter[.]” Ind. R. Evid. 804(a)(3); Fed. R. Evid. 804(a)(3).
Other circumstances here do not serve as a substitute for cross-examination. During the recorded interview, Amanda was never pushed on the critical details—the date and time she saw Aaron and Rick at their home—or the possibility that she might be mistaken. The interviewing officer was simply taking her account as she spoke in an interview in the early stages of the investigation. Amanda was not under oath, and the interviewer did not test her story to see how certain and accurate she might have been. His gentle questioning, which was surely appropriate for his purpose at the time, was not remotely like cross-examination of the sole alibi witness in a triple-murder trial with stakes of life and death.
By way of comparison, when a witness is unavailable, even former testimony is admissible under the rules of evidence only if it is offered against a party who had both an. opportunity and .a similar motive to develop that witness’s testimony by direct, cross-, or redirect examination. Ind. R, Evid. 804(b)(1); Fed. R. Evid. 804(b)(1).
If the State decides to undertake the daunting task of a third trial of Kubsch nearly twenty years after the murders, the majoritys decision will require that Amanda’s recorded statement be admitted. The State will not be able to test its accuracy through meaningful cross-examination. The prosecutor will have to question a witness who, as early as 2005, did not even remember making the statement. See Fed. R. Evid. 804(a)(3) advisory committee note (“the practical effect” of lack of memory “is to put the testimony beyond reach”); 2 McCormick on Evidence § 253 (7th ed.) (declarant who does not remember the subject matter of her testimony “is simply unavailable by any realistic standard”).
In short, Amanda’s unsworn, uncorroborated, and ex 'parte statement simply is not comparable to the McDonald confessions that were excluded improperly in Chambers. And the critical point in this *875 habeas case is that even if a reader might be persuaded that Chambers did not actually depend on the corroboration and opportunity for cross-examination that the Chambers Court itself emphasized, these differences show that the majority’s extension of Chambers to this case is not beyond fair-minded disagreement.
The majority also finds supposedly “close parallels” in the Supreme Court’s decisions in Green v. Georgia, Crane v. Kentucky, and Holmes v. South Carolina, but all are easy to distinguish. They do not support habeas relief in this very different case.
In Green v. Georgia, 442 U.S. 95, 96-97, 99 S.Ct. 2150, 60 L.Ed.2d 738 (1979), defendant Green had been convicted of capital murder. At sentencing, he offered his co-defendant’s hearsay admission that the co-defendant had actually killed the victim. That same statement had been admitted as rehable enough to justify the co-defendant’s death sentence. In Green’s case, though, the state courts excluded the same statement. The Supreme Court rejected this unfair asymmetry, but there is no such unfair asymmetry here. The prosecution could not have used Amanda’s recorded statement if it had been inculpatory. Cf. Crawford v. Washington, 541 U.S. 36, 68-69, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) (confrontation clause violated where prosecution used witness’s testimonial statement “despite the fact that [defendant] had no opportunity to cross-examine her”).
Crane v. Kentucky, 476 U.S. 683, 691, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986), offers no additional support for the majority. Defendant Crane presented evidence about the' length and manner of the interrogation that led to his confession. He wanted to show that the circumstances made his confession unreliable. The evidence was competent and properly admissible, except for one unusual substantive rule of state law. After a court had found a confession voluntary, the rule excluded otherwise competent and admissible evidence about the circumstances of the confession. The violation of the defendant’s rights was so clear that the Court could not decide whether to base its ruling directly on the due process clause under Chambers or on the compulsory process or confrontation clauses of the Sixth Amendment. Id. at 690, 106 S.Ct. 2142. The Court emphasized that the evidence was “competent, reliable evidence bearing on the credibility of a confession.” Id. That ruling on otherwise admissible evidence is not comparable to the state court ruling here, which applied a common rule of evidence to exclude hearsay.
The majority also finds a “close parallel” with Holmes v. South Carolina, 547 U.S. 319, 330, 126 S.Ct. 1727, 164 L.Ed.2d 503 (2006), where the defendant used the familiar tactics of attacking the reliability of the state’s forensic evidence and offering evidence that someone else committed the murder. The state courts applied a unique rule of state law that barred the defendant from introducing evidence of third-party guilt when the- prosecution had introduced forensic evidence that, if credited, was strong proof of the defendant’s guilt. That circular logic had been applied to bar the defense from offering otherwise admissible evidence. The Supreme Court held that the unique rule was arbitrary and unconstitutional. Id. at 331, 126 S.Ct. 1727. At the same time, however, the Court made clear how unusual the case was, noting that “[s]tate and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials.” Id. at 324, 126 S.Ct. 1727, quoting Scheffer, 523 U.S. at, 308, 118 S.Ct. 1261, and citing Chambers and Crane. '■
The odd and unfair state-court rules in Green, Crane, and Holmes simply are not *876 comparable to the Indiana court’s routine application of Rule 803(5) in Kubsch’s case, a rule that is consistent with federal law and many other states’ rules of evidence; Again,, the majority has not identified any case in any American court that has admitted such an unsworn and ex parte interview as substantive evidence when the witness was not available for cross-examination.
Toward the end of its opinion, the majority makes two observations about Indiana evidence law that warrant brief comment. First, the majority suggests that the video recording of Amanda’s interview “missed qualifying for admission under Indiana Evidence Rule 803(5) by just a hair.” Ante at 861. The video “missed” because Amanda was unable to vouch for its accuracy, where at least her claim of accuracy would have been subject to cross-examination. The vouching requirement is not a technicality. It ensures that the hearsay exception does not swallow the rule. Cases should be decided based on testimony to the jury, not recorded ex parte interviews. '
After, this en banc decision, however, trial courts in Indiana and elsewhere may hesitate to enforce the hearsay bar and other settled evidentiary rules when confronted with potentially exculpatory but plainly inadmissible evidence. Defense counsel now have a solid argument, that such evidence should be placed before the jury on expanded Chambers grounds. Trial judges reading the majority’s opinion might say no on the theory that the ruling here is so narrow and case-specific. But that’s what the Supreme Court said in Chambers, too. If cautious trial courts accept the new defense argument based on Kubsch, the integrity of the criminal trial process will be undermined. Trials should be decided based on admissible evidence from the witness stand, not ex parte statements by non-parties in low-pressure settings, especially where those non-parties are not available for later cross-examination.
The majority also suggests the Indiana courts treated Kubsch unfairly based on a “troubling lack of consistency in the application” of Rule 803(5). Ante at 861. The cases the majority cites do not support the criticism. The only Indiana Supreme Court decision cited, Small v. State, 736 N.E.2d 742, 745 (Ind. 2000), allowed admission of the witness’s deposition transcript. Such use of prior testimony is routine. See Fed. R. Evid. 804(b)(1) (allowing use of former testimony of unavailable witness when offered against party who had opportunity and similar motive to develop testimony); Ind. R. Evid. 804(b)(1) (same). Small relied on Rule 803(5), but there was no indication that the witness lacked a memory of giving the deposition (as Amanda lacks a memory of her recorded interview). Rather, like many witnesses, the witness in Small did not remember her specific deposition answers.[2]
*877 In another interesting rhetorical device, the majority attempts to shift to the State the burden of disproving Amanda’s statement, suggesting for example that the State could have subpoenaed the mother’s bank for her deposit records. Ante at 860-61. With respect, that was not the State’s burden when the defense could not support the admissibility of the unsworn, uncorroborated, ex parte witness interview. If the majority’s decision stands, the State will now have to dig into those details nearly twenty years after the fact.
Finally, it is clear that the majority’s decision is driven in large part by the life- and-death stakes in this case. See ante at 846-47, 859-60, 862. The stakes may make this case hard on judges, but they do not change the rules of evidence, nor do they justify a departure from ordinary deference under § 2254(d)(1). See White v. Wheeler, 577 U.S. at -, 136 S.Ct. at 462 (“this Court again advises the Court of Appeals that the provisions of AEDPA apply with full force even when reviewing a conviction and sentence imposing the death penalty”).
Exclusion of reliable, critical, and admissible evidence is improper even if the result is “only” years or a lifetime in prison. By the same token, exclusion of inadmissible evidence is proper even when—especially when—the stakes are higher. Exclusion of such evidence is proper no matter which side offers it.
The rules of evidence, whether in codes or case law, inevitably pose a risk of excluding some reliable and probative evidence in some cases. Our criminal justice system is not infallible, but the rules of evidence have evolved to try to improve accuracy and fairness. The residual risk of error in capital cases is deeply sobering for all of us with roles in the criminal justice .system. That risk offers a powerful policy argument against the death penalty. It does not provide a reason to disregard rules of evidence that apply to both sides and have been designed to ensure fair and reliable evaluation of evidence. The majority’s new, narrow, and case-specific exception is not compelled by Supreme Court precedent and does not support habeas relief here.

. The majority also cites Impson v. State, 721 N.E.2d 1275, 1282-83 (Ind. App. 2000), & pre-Crawford case that dealt with statements by a victim of domestic violence who was a reluctant witness, Her earlier statements bore such strong indications of ‘ reliability that the state court found no prosecutorial misconduct in efforts to impeach her exculpatory testimony in her husband’s trial. The majority also cites Flynn v. State, 702 N.E.2d 741, 744-45 (Ind. App. 1998), another pre-Crawford case where a witness—a passenger in the defendant's getaway car—gave statements to police at the scene of the defendant's arrest. The defendant had the opportunity to cross-examine her in her deposition, in a pretrial hearing, and at trial. Under those circumstances, the state court held that a taped statement by the witness was admissible under Rule 803(5). The indicia of reliability -in Flynn were plainly not present here. In any event, the rulings in both *877 cases would need further consideration after Crawford.